**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IRENE SIMMONS AND RODELL SANDERS, for themselves and others similarly situated, | ) ) ) ) | Case No. 1:20-cv-1128 |
| | ) | Judge Charles R. Norgle, Sr. |
| Plaintiffs, | ) ) ) | Magistrate Judge Jeffrey I. Cummings |
| v. | ) ) | |
| MOTOROLA SOLUTIONS, INC., and VIGILANT SOLUTIONS, LLC, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS MOTOROLA SOLUTIONS, INC.'S
AND VIGILANT SOLUTIONS, LLC'S AMENDED STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

Plaintiffs Irene Simmons and Rodell Sanders pursuant to Local Rule 56.1, hereby submit this Response to Defendant's Amended Statement of Undisputed Facts in Support of their Motion for Summary Judgment.

**PARTIES**

1. Plaintiffs Irene Simmons and Rodell Sanders are natural persons and alleged Illinois residents.

**RESPONSE:** Admit.

2. Defendant Motorola Solutions, Inc. is a Delaware Corporation with its principal place of business in Chicago, Illinois.

**RESPONSE:** Admit.

1

3. Defendant Vigilant Solutions, LLC is a Delaware limited liability company and a subsidiary of Motorola.

**RESPONSE:** Admit.

## VENUE AND JURISDICTION

4. Plaintiffs have alleged, and Defendants have admitted, that the Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2) and 28 U.S.C. § 1367. (Dkt. 37, Answer, at 10.)

**RESPONSE:** Admit.

5. Plaintiffs have also alleged, and Defendants have admitted, that the Court has personal jurisdiction over Defendants. (*Id.*)

**RESPONSE:** Admit.

6. Plaintiffs have alleged, and Defendants have admitted, that venue is proper under 28 U.S.C. § 1391(b)(3) as this Court has personal jurisdiction over Defendants. (*Id.* at 11.)

**RESPONSE:** Admit.

## BACKGROUND

7. Vigilant specializes in developing technology for law enforcement, public safety, and other government customers. (Hodnett Decl. ¶ 3 (Ex. 1).)

**RESPONSE:** Admitted in part, denied in part.

Vigilant also specializes in developing technology for banks, casinos, asset recovery companies and other private customers. *See* Exhibit 1 (2014 Vigilant Solutions Facial Recognition Overview presentation, MOTOROLA_44257–44278) at 44260 ("Customer Highlights . . .law enforcement, banking, casino, retail"); Exhibit 2 (2012

2

FaceSearch for School Security presentation, MOTOROLA_50277–50288) at 50280 (listing customers such as BMW, Bank of America, HSBC, JP Morgan Chase, and others), 50282; Exhibit 3, (Lemont Lunch & Learn presentation, MOTOROLA_48111–48142) at 48119 ("Revenue Discovery/Recover"), 48121 ("parking solutions"); Exhibit 4 (2013 Vigilant Company Overview presentation, MOTOROLA_50198–50243) at 50201 ("Vigilant – Our Customers" "Exclusive LPR Provider for US lenders"), 50214 ("Law Enforcement and Commercial Applications" listing casinos and retail among others), 50239-50240 (FaceSearch - Enrollment/Checkpoint Application: "Suspects/visitors stand in front of Camera, Operator Hits "Capture Face Button," Image sent to Vigilant Cloud Data Center (milliseconds)").

8.    Motorola acquired Vigilant in January 2019.  (*Id.* ¶ 1.)

**RESPONSE:** Admit**.**

9.    Vigilant's primary business has been and is selling license plate recognition technology to government agencies throughout the United States, including in Illinois.  (*Id.* ¶ 3; Olive Decl. ¶ 3 (Ex. 2.).)

**RESPONSE:** Denied. Vigilant's primary business is license plate recognition for the auto finance and insurance markets. *See* Exhibit 5 (Hodnett Dep.) at 43:1-12 ("Q: Okay. What products was DRN selling before FaceSearch was developed? A: Well, their primary line of business was license plate recognition to the auto finance and insurance markets…"). *Id.* at 13:8-21 (Vigilant formed through merger with in 2014). Vigilant also has a large presence with banks, casinos and retail. *See* Response to ¶7.

3

10. Through its license plate recognition business, Vigilant developed strong relationships with many government agencies, including law enforcement customers in Illinois. (Ex. 1 ¶ 4.)

**RESPONSE:** Admit.

11. Through Vigilant's work and interactions with government agencies, Vigilant learned that additional technologies—including a gallery of booking photographs, and tools to efficiently search through them to identify potential matches—would be valuable and of interest to law enforcement, public safety, and other government agencies. (*Id.*)

**RESPONSE:** Admitted in part. Vigilant learned that multiple customers would be interested in searching the booking photos, including retail businesses, banks and casinos. The first 30 customers of FaceSearch included banks, casinos and other retailers. *See* Ex. 1 (2014 Vigilant Solutions Facial Recognition Overview presentation, MOTOROLA_44257–44278) at 44260 (banks, casinos and retailers among the first 30 customers for FaceSearch).

12. To provide a booking photo gallery for government customers, Vigilant procured publicly available booking photos from third party vendors beginning in Fall 2014. (*Id.* ¶ 5.)

**RESPONSE:** Denied. Vigilant began procuring publicly available jail booking photos no later than in 2012. Ex. 2 (2012 FaceSearch for School Security presentation, MOTOROLA_50277–50288) at 50282 ("FaceSearch Data Center – populated with facial images *Criminal history photos" "Three variations of product, all interfacing with Vigilant Data Center"), 50285 ("Image matched against roughly 10 million facial

4

images" "Vigilant Data Center Database *Jail Bookings *Sexual Predators *Crime Stopper Websites).

Vigilant had over 16 million jail booking photos in 2012. Vigilant obtained these photos from sex offender websites, the CrimeStopper website, and online booking photo databases of local agencies from more than half of U.S. states. Exhibit 6 (2012 Vigilant Solutions Facial Cataloguing and Recognition, MOTOROLA_50130–50148) at 50137 ("Web based, hosted, facial image warehouse ‧ Integrated to jail booking and other online image databases"), 50138 ("Pre-populated facial images," "Integrated jail booking photos from more than half of U.S. states"); Exhibit 7 (2013 Vigilant Solutions' License Plate Reader Data and Facial Recognition for Public Records Solutions, MOTOROLA_49297–49315) at 49299 (offering "a cloud based facial recognition solution with more than 16 million gallery images of offenders nationwide"); Exhibit 8 (2012 FaceSearch brochure, MOTOROLA_47457–47458) at 47457 ("15 million+ national jail bookings hotlist" "1,000+ CrimeStopper and local agency facial image databases"). *See also* Exhibit 9 (2013 version of VigilantSolutions.com website, *available at* https://web.archive.org/web/20131206192118/http://vigilantsolutions.com/ products/facesearch_facial_recognition) ("FaceSearch's intuitive interface is enabled by millions of pre-populated face images from Vigilant via registered sex offender, CrimeStopper and other websites.").

13. After obtaining these booking photos, Vigilant uploaded the photos to its servers, analyzed the photos to draw information from them in order to be able to search and compare the photos, and compiled the photos and information into a gallery that government agencies could search. (*Id.*)

**RESPONSE:** Denied in part. Vigilant could not search and compare photos just by analyzing the photos. Vigilant had to create a new digital representation of a person's face, called a "face print," that does not exist, nor can be seen, in the original photographs that Vigilant obtained. Vigilant developed special facial vectoring algorithms to harvest data points and then create these new "face print" consisting of biometric information overlaid over the booking photo, and it was the face print not the photograph that was used for comparison purposes. Exhibit 10 (Facial Recognition Terminology, MOTOROLA_44394–44395) ("Face Print: A digitally recorded representation of a person's face that can be used for identification of the person based on unique characteristics. Also known as a Face Template."); Exhibit 11 (Vigilant Solutions FaceSearch product information, MOTOROLA_PLAINTIFFS_3–8) at 4 (FaceSearch "quickly analyze[s] over 350 facial vectors: we continue to refine and innovate to deliver more accurate recognition results"), *id.* ("The algorithm creates a face print of the probe image"); Exhibit 12 (FaceSearch Sell Sheet, *available at* https://milleniumproducts.net/wp-content/uploads/2019/08/Face-Search.pdf) at 2 ("Over 350 facial vectoring algorithms are at the heart of Vigilant Solutions' FaceSearch. Rather than making use of commercially available facial recognition engines, Vigilant leveraged its experience in image recognition to develop these new facial vectoring algorithms in-house. Why? - to benefit you in terms of accuracy, speed, and flexibility in deployment.")

## THE FACESEARCH TECHNOLOGY

14. Vigilant also developed technology to quickly and efficiently search through photos to identify potential matches, including FaceSearch. (*Id.* ¶ 6; Ex. 2 ¶ 6.)

**RESPONSE:** Admitted in part but denied to the extent the word "also" implies that this technology is distinct from the search technology discussed in Response No. 14, above.

15. Vigilant contracted to provide its government agency customers with the ability to search through a gallery of booking photos. (Ex. 1 ¶ 6; Ex. 2 ¶ 6.)

**RESPONSE:** Admitted in part. Vigilant also contracted to provide this ability to private companies including banks, casinos and retailers. See Ex. 1 (2014 Vigilant Solutions Facial Recognition Overview presentation, MOTOROLA_44257–44278) at 44260 (banks, casinos and retailers among the first 30 customers for FaceSearch). *See also, e.g.,* Exhibit 13 (Sales Orders Spreadsheet, MOTOROLA_34220) at line 1268 (noting sale of FaceSearch to Hulman Motor Sports 500 Speedway by Capitol Electronics in 2017); Exhibit 14 (Vigilant Reseller Agreement with Capitol Electronic Sales Inc., MOTOROLA_43255–43275) at 43270 (product list includes FaceSearch), 43273 ("Reseller's Market Includes…Commercial"); Exhibit 15 (Vigilant Reseller Agreement with LATECH LLC, MOTOROLA_43718–43758) at 43733 (product list includes FaceSearch), at 43735 ("Reseller's Market Includes: Public Safety, Education, Prisons, Parking, Casinos"); Ex. 13 (Sales Orders Spreadsheet, MOTOROLA_34220) at line 5756 (noting sale of FaceSearch to ProminvestBank).

16. In addition, a government agency can create their own "gallery" to be searched by uploading images to it. (Ex. 1 ¶ 6.)

**RESPONSE:** Admitted in part. To be searchable using FaceSearch, Vigilant still needs to create a digitally recorded reproduction of the government's photo using its special facial vector algorithms. See Response to ¶13, above.

17.     Using the booking photo gallery and FaceSearch tool, a government agency can compare a "probe image" obtained by the agency (*e.g.*, an image of a robbery suspect) with booking photos contained in the gallery. (*Id.*; Ex. 2 ¶ 6.)

**RESPONSE:** Admitted in part. To be searchable using FaceSearch, Vigilant still needs to create a digitally recorded reproduction of the government's photo using its special facial vector algorithms. See Response to ¶13, above.

18.     FaceSearch performs that comparison by analyzing and comparing certain facial characteristics of the subjects in the probe images and in the photos being searched. (Ex. 1 ¶ 6.)

**RESPONSE:** Admitted in part. To be searchable using FaceSearch, Vigilant still needs to create a digitally recorded reproduction of the government's photo using its special facial vector algorithms. See Response to ¶13, above.

19.     In performing its comparisons, FaceSearch only uses information that is shown in the photo itself. (*Id.*)

**RESPONSE:** Denied. See Response to ¶13, above.

20.     FaceSearch does not use any information about a person's face that is not contained in the photo itself. (*Id.*)

**RESPONSE:** Denied**.** FaceSearch creates a new digital representation, called a Face Print, that is not contained in the photo itself and does not exist publicly. See Response to ¶13, above.

21.     In response to a search of booking photos performed by a government agency, FaceSearch communicates only potential matches, confidence intervals indicating the strength of the matches, and information associated with the potential

8

matches (*e.g.*, name, jurisdiction creating the booking photo, and sometimes conviction information). (*Id.* ¶ 7.)

**RESPONSE:** Denied. It also provides booking photo pictures. Ex. 5 (Hodnett Dep.) at 59:14-24 ("…the system will return a number of jail booking photos that the software thinks match the probe image. So it'll display for you or communicate potential matches on the screen.")**.**

## DEFENDANTS' GOVERNMENT CUSTOMERS

22.     Defendants have not contracted with anyone other than government agencies to provide access to the booking photo gallery. (*Id.* ¶ 8; Ex. 2 ¶ 7.)

**RESPONSE:** Denied.

Vigilant provided FaceSearch to banks, casinos, retailers and others. See Response to ¶15, above. *See also, e.g.,* Ex. 13 (Sales Orders Spreadsheet, MOTOROLA_34220) at line 1268 (noting sale of FaceSearch to Hulman Motor Sports 500 Speedway by Capitol Electronics); Exhibit 14 (Vigilant Reseller Agreement with Capitol Electronic Sales Inc., MOTOROLA_43255–43275) at 43270 (product list includes FaceSearch), 43273 ("Reseller's Market Includes…Commercial").

FaceSearch includes access to the Vigilant Data Center which has contained booking photos since at least 2012. Ex. 2 (2012 FaceSearch for School Security presentation, MOTOROLA_50277–50288) at 50282 ("FaceSearch Data Center – populated with facial images *Criminal history photos" "Three variations of product, all interfacing with Vigilant Data Center"), 50285 ("Image matched against roughly 10 million facial images" "Vigilant Data Center Database *Jail Bookings *Sexual Predators *Crime Stopper Websites); Ex. 4 (2013 Vigilant Solutions Company Overview

9

presentation, MOTOROLA_50198–50243) at 50233 ("FaceSearch Basics" "Pre-populated facial images: Web crawler auto-updates sexual predator and Crimestopper facial images from thousands of websites"), 50241 ("Image uploaded to Vigilant Data center, Image matched against roughly 10 million facial images, Results returned in less than 3 seconds; Vigilant Data Center Database: *Jail Bookings *Sexual Predators *Crime Stopper Websites"); Ex. 9 (2013 version of VigilantSolutions.com website) ("FaceSearch's intuitive interface is enabled by millions of pre-populated face images from Vigilant via registered sex offender, CrimeStopper and other websites."), *available at* https://web.archive.org/web/20131206192118/http://vigilantsolutions.com/products/facesearch_facial_recognition; Exhibit 16 (2013 Vigilant Solutions Comprehensive Video Analytics Solutions Brochure, MOTOROLA_44794–44830) at 44807 (prepopulated facial images using web crawler; datacenter allow speed of querying 10 million records in less than 3 seconds); Ex. 1 (2012 Vigilant Solutions Facial Cataloguing and Recognition, MOTOROLA_50130–50148) at 50137 (noting use for fraud prevention).

23.     Government agencies use their access to the booking photo gallery for a variety of investigative activities, including identifying potential crime suspects and victims. (Ex. 1 ¶ 8.)

**RESPONSE:** Admit**.**

24.     Since 2014, Vigilant has been a contractor providing government agencies in Illinois with the ability to search and compare booking photos. (*Id.* ¶ 9; Ex. 2 ¶ 9.)

**RESPONSE:** Denied.

First, the statement is vague as to time frame.

10

Second, to the extent that Defendants intend to suggest that it had a contract to license FaceSearch with an Illinois government agency prior September 30, 2014 (the earliest date that Defendants acknowledge they have Plaintiff's booking photo) the statement is denied.

Neither affiant has personal knowledge of the consummation of a contract with Wilmette. Exhibit 17, (Olive Dep.) at 40:1-7 (Olive's job duties do not include reviewing contracts), 36:9-17 (legal counsel provided Wilmette contract to Olive), 61:18-20 (only reviewed Wilmette contract for this case); Exhibit 18 (30(b)(6) Dep.) at 231:17-21, 237:1–238:1. Olive did not even work at Vigilant in 2014, the year in question. Ex. 17 (Olive Dep.) at 7:23–8:1. They rely only on the documents. Ex. 5 (Hodnett Dep.) at 71:19-24 ("I know that the contractual records of the company indicate that that is the case").

The contract document Defendants tendered does not say that it is for FaceSearch, it only mentions license plate recognition data. Doc. 114-1 at 10 ("A. Vigilant stores and disseminates to law enforcement agencies publicly and privately gathered license plate recognition (LPR) data as valued added component of the Vigilant law enforcement package of LPR equipment and/or software; and B. Agency desires to obtain access to Vigilant's Software Service with available publicly and privately collected LPR data via the Law Enforcement Archival Reporting Network (LEARN) server; NOW, THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties, the parties agree as follows…."). This contract is not signed by anyone from Vigilant. *Id.* at 17.

There is also additional evidence that no contract was formed. The purchase

11

order that Defendants presumably claim is evidence that Wilmette purchased FaceSearch (it lists multiple items such as one license plate reader system) is for a total of $11,480. Exhibit 19, (Vigilant Project Quotation for Wilmette Police Department, MOTOROLA_9343–9344). The Village did not issue a check to Vigilant until December 2014, and when it did so the amount was $12,380. *See* Exhibit 20 (Wilmette Disbursement Report dated December 2014) at 7, also available at https://www.wilmette.com/download/finance/disbursements_reports/2014/Dec-2014-Disbursement-Report.pdf.

The inference from the foregoing facts is that the unsigned contract document Defendants tendered was not consummated. Rather, the inference is that some later contract was entered into for which Defendants did not provide the purchase order. Therefore, drawing inferences in Plaintiffs favor, Defendants have failed to preclude an issue of fact on having a contract with Wilmette prior to September 30, 2014 (moreover, they have failed to preclude a question of fact as to whether they contracted with Wilmette for FaceSearch at any time). Ex. 18 (30(b)(6) Dep.) at 239:20-23, 241:4-14. Relatedly, Defendants provide no proof that a sergeant can bind the Village under its procurement rules. *Id.* at 238:19–239:4.

25.     For example, in a contract dated September 25, 2014, the Wilmette Police Department ("Wilmette PD") contracted to purchase a software package from Vigilant that included access to "FaceSearch facial recognition," the ability to search a "Facial Recognition gallery," and ongoing "software upgrades" and "utilities released within the product evolution." (Ex. 1 ¶ 9; Ex. 2, at Ex. A.)

**RESPONSE:** Denied. See response to ¶24, above.

12

26.     Vigilant also has had similar contracts to provide those services to government agencies outside Illinois, such as a contract with the Beaumont, California Police Department dated June 24, 2014, to provide "FaceSearch Hosted Facial Recognition" among other products. (Ex. 1 ¶ 9; Ex. 2 at Ex. B.)

**RESPONSE:** Denied. The attached documents do not contain a signed contract. There is no service agreement like the (unsigned) document tendered for Wilmette. Compare Doc. 114-1 *to* Doc. 114-2; Ex. 5 (Hodnett Dep.) at 87:24-88:13. The Order Entry Form does not mention FaceSearch. Doc. 114-2 at 11-12. Furthermore, Motorola provided only an expenditure approval form, and that form states that the product was *not* ordered (the "No" box is checked). Doc. 114-2 at 7. According to a response from the City of Beaumont to a request made under the California Public Records Act, it has no record of a contract with Vigilant for facial recognition products. Exhibit 21 (CA Public Records Act Response from City of Beaumont, MOTOROLA_PLAINTIFFS_003392–MOTOROLA_PLAINTIFFS_003406 ) at 2.

27.     Vigilant has had active contracts with government agencies in Illinois to provide access to the booking photo gallery and with tools to search it, including FaceSearch. (Ex. 1 ¶ 10; Ex. 2 ¶ 9.)

**RESPONSE:** Denied. The statement is vague as to timeframe. To the extent Defendants intend the vague statement to mean that they had such contracts as of September 30, 2014, it is denied. First, the citation to the Hodnett Declaration only states that there were active contracts at the time he left Motorola. Doc. 113 at ¶ 10. Hodnett left Motorola in May 2021. *Id.* ¶ 1. The Olive Declaration states that Vigilant had such contract throughout his employment with Vigilant and Motorola, Doc. 114 at

13

¶ 9, however, he did not join them until June of 2019. *Id*. at ¶ 1. Therefore, there is no foundation for the statement prior to June of 2019. Further, at his deposition, Mr. Olive could not name any Illinois customers referred to in paragraph 9 of his declaration. Ex. 17 (Olive Dep.) at 35:2-19. To the extent he relied upon the documents of the supposed Wilmette contract, see response to ¶24, above.

28.    Vigilant also has had active contracts with government agencies outside Illinois to provide access to the booking photo gallery and with tools to search it, including FaceSearch. (Ex. 1 ¶ 10; Ex. 2 ¶ 9.)

**RESPONSE:** Denied. First, the statement is vague as to timeframe. Second, see response to ¶27, above.

29.    In addition, Vigilant has had subcontracts with government prime contractors to provide government agencies, such as the FBI, with access to the booking photo gallery and with tools to search it, including FaceSearch. (Ex. 1 ¶ 10; Ex. 2 ¶ 9.)

**RESPONSE:** Denied in part. The statement is vague as to timeframe. The statement is unsupported as to any timeframe prior to when Olive joined Vigilant in June 2019.

**THE USE OF PLAINTIFFS' PHOTOS IN THE BOOKING PHOTO GALLERY**

30.    Defendants have conducted a search to determine whether government booking photos of Plaintiff Irene Simmons, or Plaintiff Rodell Sanders were included in the booking photo gallery. (Ex. 2 ¶ 12.)

**RESPONSE:** Admitted in part. Defendants searched only the booking photos they obtained from third party vendors in or around September of 2014. Ex. 18 (30(b)(6) Dep.) at 79:12–80:8. *See also* response to ¶32, below.

14

31.     Booking photos of Irene Simmons and Rodell Sanders have been included in the booking photo gallery. (*Id.* ¶ 12.)

**RESPONSE:** Admit.

32.     The first time that Vigilant obtained any information from a booking photo of Plaintiff Sanders was September 30, 2014. (*Id.* ¶ 12.)

**RESPONSE:** Denied.

The statement lacks foundation because Defendants only searched the booking photos they obtained from third party vendors in or around September of 2014. Ex. 18 (30(b)(6) Dep.) at 81 (TLO booking photos no longer exist), 134 (no way to search the booking photo gallery that contained the TLO photos). They did not search the 16 million jail booking photos Defendants had prior to September 2014 because they deleted those photos. Ex. 18 (30(b)(6) Dep.) at 81:16–82:4 (TLO went into bankruptcy, TransUnion acquired it out of bankruptcy after which Vigilant "had to get rid of that TLO data"), 107-108 (deleted TLO after TransUnion bought them in the bankruptcy), 108:15–109:2 (deleted TLO photos before obtaining new photos from a different vendor), 125 (TLO database contained jail booking Photos). Ex. 17 (Olive Dep.) at 53:3-14 ("Q: So for example, this one, … has an upload time of 9/30/2014 at 13:42. And so whether that was the time that this specific picture got uploaded or whether that was the time when the whole data file from FEMIS got uploaded, that would be the earliest time when Mr. Sanders' picture would have appeared within the booking photo database that comes with the Face Search product, correct? A: **So I can't say for sure that it's the first time that he was uploaded in the system**. This is the first one that we found when we ran the search.").

15

Prior to deleting the TLO database, Vigilant's data center covered more than half of the states. Exhibit 6 (2012 Vigilant Solutions Facial Cataloguing and Recognition, MOTOROLA_50130–50148) at 50138 ("Integrated jail booking photos from more than half of U.S. states"). After TLO's database was deleted, Vigilant engaged with a new vendor called Likeness, from which it began downloading a database of booking photos. Ex. 18 (30(b)(6) Dep.) at 112:3-7 (Vigilant ultimately replaced TLO's photos with photos from Likeness, a data company that aggregated booking photos), 118-119 (starting getting photos from Likeness), 121 (Likeness photos were jail booking photos), 124-125 (deleted millions of jail booking photos, then Likeness photos replaced TLO photos). The Likeness agreement was signed on August 24, 2014. Exhibit 22 (Likeness Data Feed License Agreement, MOTOROLA_39628–39635) at 39634. Mr. Sanders' photograph file with the September 30, 2014 upload date came from Likeness, and that booking photo was from Plaintiff's 2007 admission to Cook County Jail. Ex. 18 (30(b)(6) Dep.) at 135:11-13, *see id.* at 143:9-18, 144:6–145:5 (from CCJ booking database); Exhibit 23 (Sanders' Booking Photo, Motorola 39640).

It is reasonable to infer that Plaintiff Sanders' 2007 booking photo was in the 14 million deleted photos. PSOAF at ¶9.

Second, Defendants did not conduct a search using Mr. Sanders' face. Ex. 17 (Olive Dep.) at 41:21–42:7 (searched booking photo gallery by name). Nor did they search for any alias names that Mr. Sanders may have been associated with in his jail booking photo. Exhibit 24 (Sanders Declaration) at ¶5; Ex. 17 (Olive Dep.) at 53:15-17 ("Q: Okay. Because he might, for example, have been in there under another name? A: I mean hypothetically, that's possible."). Instead, he apparently searched one "potential

alias name" but not for both plaintiffs and not all possible alias names. *Id.* at 69-70.

33.     The first time that Vigilant obtained any information from a booking photo of Plaintiff Simmons, which also appears on the official website of the Chicago Police Department, was January 25, 2022. (*Id.* ¶ 12.)

**RESPONSE:** Denied**.** The material submitted in support of the asserted fact does not establish the affiant's basis for making this claim, given his lack of personal knowledge and the deletion of millions of booking photos that existed in the Vigilant data center prior to Vigilant contracting with Likeness in 2012. Plaintiffs object to the lack of foundation. See Response to ¶32, above.

34.     Since Vigilant began assembling the booking photo gallery in September 2014, Vigilant has at all times had contracts with government agencies in Illinois to provide the ability to search booking photos. (*See* Ex. 1 ¶¶ 9, 12; Ex. 2 ¶ 9.)

**RESPONSE:** Denied. First, Vigilant began assembling the booking photo gallery in 2012. See responses to ¶¶11-12, above.  Second, Plaintiffs deny that Defendant had contracts with government agencies in Illinois to search the booking photos at the relevant times. See responses to ¶¶23-27, above.

Respectfully submitted,

/s/ Michael Kanovitz
Attorneys for Plaintiffs

Arthur Loevy
Michael Kanovitz
Jon Loevy
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, Illinois 60607
(312) 243-5900
mike@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, Colorado 80302
(720) 328-5642

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Michael Kanovitz, an attorney, certify that on October 3rd, 2022, I filed a copy of the attached Plaintiffs' Response to Defendants Motorola Solutions, Inc. and Vigilant Solutions, LLC's Amended Statement of Undisputed Material Facts in Support of Summary Judgment via the Court's electronic filing system and thereby served a copy on all counsel of record.

/s/ Michael Kanovitz

19