# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IRENE SIMMONS AND RODELL SANDERS, for themselves and others similarly situated, | ) ) ) ) ) | Case No. 1:20-cv-1128 Judge Charles R. Norgle, Sr. |
| Plaintiffs, | ) ) ) | Magistrate Judge Jeffrey I. Cummings |
| v. | ) ) | |
| MOTOROLA SOLUTIONS, INC., and VIGILANT SOLUTIONS, LLC, | ) ) | |
| Defendants. | | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS
MOTOROLA SOLUTIONS, INC. AND VIGILANT SOLUTIONS, LLC'S
AMENDED MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

I.     Summary Judgment Standard ........................................................... 3

II.    Defendants Have Failed To Preclude A Question Of Fact For Multiple Key Pillars Of Their Motion. ................................................................. 4

      A.    Vigilant Provides The FaceSearch Database To Private Customers ..... 6

      B.    Vigilant's Failure To Address The 14 Million Deleted Photos Precludes Summary Judgment. .......................................................... 11

      C.    Defendants Also Fail To Preclude A Factual Dispute About Whether They Had A Government Contract In September Of 2014. ................. 15

III.    Defendants' First Amendment Challenge Fails As A Matter of Fact and Law. ................................................................................................. 17

      A.    Defendants Create and Sell Private Biometric Data That Is Not Publicly Available. ................................................................. 18

      B.    Strict Scrutiny Does Not Apply. ......................................... 20

IV.    Defendants Have Failed To Carry Their Burden At Summary Judgment On Their Dormant Commerce Clause Challenge. ............................... 27

V.    Defendants' Unjust Enrichment Defense Fails. .............................. 28

**INTRODUCTION**

Defendants Motorola Solutions, Inc. ("Motorola") and Vigilant Solutions, LLC's ("Vigilant") (collectively, "Defendants") ambitious attempt to jettison Plaintiffs' case before discovery has even concluded depends on a central premise that is false. Vigilant was not, in fact, a "government contractor" under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/25(e), so it cannot be exempted from liability under BIPA. At all relevant times, Vigilant sold FaceSearch to *private* customers, including banks, casinos, and retail clients. There is no BIPA exemption for that, nor do Defendants claim otherwise. Their approach instead has been to ignore all the evidence of private customers, but that strategy fails at summary judgment given their burden to demonstrate the absence of material factual disputes.

Defendants' motion also rests heavily on a timeline of events that is not borne out by the record. Defendants claim that they did not create FaceSearch or build their database of booking photos until after they became "government contractors," but there is little evidence that they were government contractors at all. They have not argued, let alone established, that they performed government functions on behalf of a government agency. Likewise, they have failed to produce an executed contract (or in one case, any contract at all), nor proof that FaceSearch was purchased, by either of the two purported government-contractor relationships they claim to have had. Even more alarming, they have simply ignored that Vigilant obtained millions of booking photos *before* its first purported government contract in 2014, which violates BIPA without exception, and that Plaintiff Sanders' booking photo was likely among those early photos. The factual record simply cannot support judgment: the central

1

pillars of Defendants' motion are hotly disputed, and those disputes must be resolved only by the fact-finder.

Defendants also mount challenges to BIPA itself, asking this Court to strike down the statute as unconstitutional under the First Amendment and the dormant commerce clause. Neither challenge has any legal merit. With respect to the First Amendment, Defendants' argument fails from the start, as here, too, their characterization of the facts is belied by the facts themselves. Defendants claim robust First Amendment protection by arguing that they are merely republishing publicly available photos, obtained from the government. As their own marketing materials show, however, Vigilant has done much more than that. It has created a digital representation that is distinct from the original photograph, which contains private and unique biometric identifiers for each person, and is not publicly available. For this reason, courts have easily rejected similar constitutional challenges to the ones Defendants make here. When the actual facts are considered, it is clear that BIPA does not unduly burden speech. This Court should decline to rule BIPA unconstitutional, as no other court has done.

At bottom, Defendants must defend their conduct on the merits. They cannot trigger BIPA's safe harbor provision for government contractors, nor avoid the statute altogether through groundless constitutional challenges. The Illinois legislature passed BIPA to protect individuals against growing intrusions on their basic privacy. The stakes are high: biometric information of the type obtained and sold by Defendants is "biologically unique to the individual; therefore, once compromised, the

2

individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *See* 740 ILCS 14/5(c).

For the reasons set forth below, summary judgment must be denied.[1]

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether a fact question remains, courts must assess the evidence "as a whole," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 106 S.Ct. 1348, 1355-56 (1986), construe the facts in the light most favorable to Plaintiff, and draw all fair inferences the totality supports in favor of Plaintiff. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). The Supreme Court has repeatedly emphasized the "importance of drawing inferences in favor of the nonmovant." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). In so doing, the court "may not make credibility determinations, weigh the evidence or decide which inferences to draw from the facts." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is, of course, inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[1] To accommodate page limitations, Plaintiffs have recited the relevant facts within each applicable section of the legal argument, below. "RDSF" refers to Plaintiffs' Response to Defendants' Statement of Facts. "PSOAF" refers to Plaintiffs' Statement of Additional Material Facts.

As courts within this Circuit and beyond have routinely held, moreover, early motions for summary judgment, filed before all parties have conducted fulsome discovery, are "premature" and essentially ask for extraordinary relief. *See Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 865–66 (7th Cir. 2019) (citing cases).

## II. Defendants Have Failed To Preclude A Question Of Fact For Multiple Key Pillars Of Their Motion.

Defendants' summary judgment motion rises and falls with their contention that they acted *solely* as a government contractor. This is so because, as Defendants are well aware, the safe harbor applies only to work done for and at the behest of the government. Even if a company qualifies as a government contractor (which, as is explained below, Defendants do not) it has no exemption for work performed for private customers. *See* 740 ILCS § 14/25(e) ("Nothing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit of government ***when working for that State agency or local unit of government***.") (emphasis added); *e.g. Enriquez v. Navy Pier, Inc.*, 2022 IL App (1st) 211414-U (1st Dist. Sep. 27, 2022) at *1 (contractor worked exclusively for unit of local government).

Thus, Defendants assert that they created the FaceSearch biometric database exclusively for police departments and that they have never given private companies access. However, this supposed fact is not only highly disputed, it is contradicted by the companies' own documents and admissions. The facts for purposes of this early summary judgement motion are that Defendants provide their FaceSearch biometric database of to a host of private customers including banks, casinos, and other non-government entities concerned about criminal activity on their premises. RDSF at

4

¶¶7, 11, 15. Defendants have not even suggested an arguable exemption for providing the database to private customers even if they simultaneously sold the database to government customers as well. For this reason alone, the motion must be denied.

The motion also fails for the additional reason that Defendants' timeline is an anachronism. Defendants' affiants assert that Motorola did not create FaceSearch until 2014 and, thus, did not operate before it had an Illinois government contract with Wilmette. Doc. 112 at 11-12. The assertion that Vigilant did not create FaceSearch until 2014 explains the incredibly fortuitous timing on which the motion is predicated: Vigilant got its first Illinois contract on September 25, 2014 and received Plaintiff Sanders' booking photo on September 30, 2014, a five day margin. Doc. 112 at 12-13. Defendants attempt to prove that they did not have Plaintiff Sanders' photograph before the Wilmette contract by pointing to a record showing that *that* photo file was uploaded to its system on September 30.

The affidavits contain additional inaccuracies. In truth, Vigilant created FaceSearch in 2012, not 2014, and stocked it with 16 million booking photos, many of which it licensed from a data vendor. RDSF at ¶11, 12. In 2014, the vendor terminated the license, so Vigilant had to delete the photos and find a new vendor to replace them. RDSF at ¶32. The photograph file with the September 30, 2014 upload date came from the replacement vendor. *Id*. Vigilant did not keep records of the files it deleted, thus, the most it can say is that the replacement vendor's file was uploaded after the Wilmette contract. *Id.*

Plaintiffs' additional facts show that Plaintiff Sanders' photo, which was from his 2007 booking in the Cook County Jail, was available to the public from 2007 through 2014, meaning that the original vendor in 2012 would have supplied it too. PSOAF at ¶¶1, 9. Thus, the affidavits on which Defendants rely misrepresent when FaceSearch started and leave out entirely the deletion and replacement of the booking photos.

A third, independently sufficient reason why the motion fails is because the Wilmette contract was never executed and therefore does not make Defendants government contractors. RDSF at ¶¶24-25. Similarly, to the extent that Defendants rely on the Beaumont, California "contract," that reliance fails because Defendants did not include any contract document. RDSF at ¶26. Defendants provided only an expenditure approval form and that form states that the product was *not* ordered (the "No" box is checked). *Id*. Moreover, a FOIA to Beaumont, states that it found no contract with Motorola (Vigilant at the time). *Id*. Accordingly, applying the correct standard at summary judgment, Defendants fail to show that they had a contract with either Wilmette or Beaumont before they uploaded Plaintiff Sanders' picture from the replacement vendor.

### A. Vigilant Provides The FaceSearch Database To Private Customers

At the outset, Defendants' motion must be denied because it sold FaceSearch to private customers. In response to Defendants' SOF on this point, Plaintiffs cited Vigilant's promotional materials stating that it sold FaceSearch to a broad range of clients, including "banking, casinos, retail" as well as law enforcement. *See* RDSF

¶¶7, 11-12, 15, 22. *See also,* e.g., Exhibit 1 (Vigilant Solutions Facial Recognition Overview brochure, MOTOROLA_44257-44278) at 44260. Given these admissions by Vigilant, it is not a fact that Vigilant sold FaceSearch only to government agencies. *See* RDSF ¶¶7, 11-12, 15, 22.

In addition to brochures discussing the bank, casino, and retailer customers for FaceSearch generally, Plaintiffs also found references to several private purchases buried in spreadsheets. RDSF ¶¶15, 22, *citing, e.g.,* Exhibit 13 (Sales Orders Spreadsheet, MOTOROLA_34220) at line 1268 (noting sale of FaceSearch to Hulman Motor Sports 500 Speedway by Capitol Electronics in 2017), *id.* at line 5756 (noting sale of FaceSearch to ProminvestBank); Exhibit 14 (Vigilant Reseller Agreement with Capitol Electronic Sales Inc., MOTOROLA_43255–43275) at 43270 (product list includes FaceSearch), 43273 ("Reseller's Market Includes…Commercial"); Exhibit 15 (Vigilant Reseller Agreement with LATECH LLC, MOTOROLA_43718–43758) at 43733 (product list includes FaceSearch), at 43735 ("Reseller's Market Includes: Public Safety, Education, Prisons, Parking, Casinos").[2]

Accordingly, the actual facts at summary judgement do not fit the BIPA exception for government contractors. At its core, the government contractor exemption is intended to protect companies working at the direction of the government. Hence the phrase "contractor, subcontractor, or agent of a State agency

---

[2] This is not to say that these were the only private purchases of FaceSearch. Motorola did not produce the sales contracts with private customers as it did with its government customers. What matters at this stage, though, is that the brochures and the spreadsheet entries demonstrate a question of fact precluding summary judgment such that this case should proceed past early summary judgment to further factual development.

or local unit of government" and the express limitation to "when working for that State agency or local unit of government." 740 ILCS 14/25(e). Defendants want to expand this exemption to include an entrepreneurial free agent who develops a product to sell to whoever it chooses and does not work under the government's control, but they cannot justify such an extension. As an exemption to the statute, the government contractor provision must be strictly construed. *People v. Charles Levy Circulating Co.*, 17 Ill. 2d 168, 171, 161 N.E.2d 112, 114 (1959) ("It is a rule of general acceptance as to the construction of statutes, that exceptions or provisos found in a statute are to be strictly construed*"); Off. of Lake Cnty. State's Att'y v. Hum. Rts. Comm'n*, 235 Ill. App. 3d 1036, 1048, 601 N.E.2d 1294, 1302 (1992) ("[E]xceptions or provisos in a statute, being designed to qualify or limit what is affirmed in the body of an act, should be strictly construed"). *See also Jack Bradley, Inc. v. Dep't of Emp. Sec.*, 146 Ill. 2d 61, 75, 585 N.E.2d 123, 129 (1991) ("[B]ecause the Act was enacted with the public welfare in mind, construction of its provisions should favor inclusion, and there is a strict burden of proof placed upon one claiming an exemption").

Defendants have not, and cannot, supply a single case where the safe harbor for government work was extended to a vendor that sells biometrics to both private and government customers. This is unsurprising given that the General Assembly was envisioning a "contractor, subcontractor, or agent" of the government carrying out the government's instructions with regard to biometrics, not an entrepreneurial free agent harvesting biometric data for its own business (while working for itself)

8

and with unfettered discretion to sell its biometric data products to whomever it chooses. For instance, Defendants cite the recent *Enriquez* decision which applied the BIPA exemption to a non-profit agency. 2022 IL App (1st) 211414-U at *4. There, the non-profit defendant was formed to carry out a specific government function – managing Navy Pier on behalf the municipal entity that owns it, the Metropolitan Pier and Exposition Authority ("MPEA"). *Id.* at *3. The court found significant the facts that the contractor was performing a government function pursuant to a contract with MPEA, and that the government unit maintained oversight.

Defendants have not even argued, let alone established at summary judgment, that they performed a government function or that the government directed them in any way. To the contrary, Vigilant used a standard software licensing agreement that it wrote and which states: that it grants the agency a non-exclusive license to use its software, that Vigilant retains the right to sell the software to whomever it choses, that it prevents the agency from sharing the product with anyone else, that it prohibits the agency from disclosing Vigilant's confidential information, that it obligates the agency not to disparage Vigilant, that it allows Vigilant to terminate the license, that it makes clear that Vigilant was not to be construed to be the agent of the licensee, and that it gives Vigilant the right to make any other business decisions it deemed commercially reasonable, among other provisions that are inconsistent with being a "contractor, subcontractor or agent," of the municipal entity. PSOAF at ¶4.

9

The unpublished circuit court opinion in *Thornley* is no more helpful to Defendants' position. *See Thornley et al. v. CDW-Gov't LLC et al.*, No. 2020 CH 04346, filed as Doc. 115-1. There, the Chicago Police Department ("CPD") hired the Defendant CDW to procure it a copy of a biometric database from a third party. *Id.* at 1. Given these facts, the court found that CDW was employed by CPD to perform a particular service on its behalf, and as such was "working for" CPD within the meaning of Section 25(e). *Id.* There was no allegation that CDW procured the database for anyone else and so no finding that a free-agent entrepreneur is "working for" a unit of local government when it sells them a product that it developed and markets far and wide. Rather, liability was predicated on the single act of the single procurement. Moreover, there was certainly no evidence that CDW sold the biometrics to private customers.

Unlike CDW, Vigilant was a free agent, expressly *not* under the direction or control of any municipal authority. Moreover, it sold the biometrics to numerous customers including private customers like banks and casinos. RDSF at ¶¶7, 11, 15, 22.

Defendants thus fail to cite any apposite cases. In point of fact, there are no apposite cases, first, because Section 25(e) was never meant to apply to a self-directed mass vendor like Defendants and, second, because Section 25(e) does not relieve a company of liability when it is working for private entities.[3]

---

[3] With respect, Amici's brief does not move the needle. That the technology offered through FaceSearch is useful to law enforcement is not at issue. Nor do Plaintiffs challenge that law enforcement, as well as government contractors, are permitted to utilize biometric data to the extent allowed by BIPA. Amici's brief does not address Vigilant's sale of biometric

10

### B.     Vigilant's Failure To Address The 14 Million Deleted Photos Precludes Summary Judgment.

In addition to Defendant's business model falling outside the scope of the government contractor exemption, Defendant also fails to establish the necessary chronology, *i.e.*, that it even had a government contract before collecting Plaintiffs' biometrics.

In 2012 and 2013, long before Vigilant claims it signed a contract to provide FaceSearch to a government customer, FaceSearch had a database of over 16 million booking photos. RDSF at ¶12, *citing, e.g.,* Ex. 7 (2013 Vigilant Solutions' License Plate Reader Data and Facial Recognition for Public Records Solutions, MOTOROLA_49297–49315) at 49299. Among these were 14 million photos licensed to it by a company called TLO. RDSF at ¶12, PSOAF at ¶¶8-9. TLO went into bankruptcy and then was bought in 2014. RSOF at ¶32. Once it was bought, Vigilant lost the license to use the TLO booking photos and had to delete them. *Id.*

Importantly, Vigilant failed to retain any records of who appeared in those 14 million deleted photos. *See* RDSF at ¶32. Accordingly, Motorola has no basis to preclude a question of fact: it cannot say that it had a government customer for FaceSearch before collecting Plaintiffs' biometrics. Defendants' claims that FaceSearch's booking photo gallery did not exist until 2014 cannot be squared with

---

information and FaceSearch to non-government entities, nor does it argue that Section 25(e) should shield Vigilant for liability given that it has engaged in private sales, has not established contracts with government agencies for the relevant time periods, and has not demonstrated that it was carrying out a government function.

11

the fact that Vigilant had millions of booking photos prior to 2014 and that, as explained below, Mr. Sanders' was likely one of them.

Defendants are caught in a trap of their own making. They have not only failed to provide evidence to preclude a question of fact as to whether Plaintiff Sanders was in the deleted photos, they have waived any such argument by pretending there were no photos. Having intentionally left 14 million photos unaddressed, Defendants necessarily fail to meet their burden to preclude a question of fact and so their motion must be denied. *See Baker v. Ghidotti*, No. 11 C 4197, 2014 WL 1289566, at \*7 (N.D. Ill. Mar. 28, 2014) (defendants moved for summary judgment but failed to discuss certain elements and "ignore[d] pertinent factual disputes," despite the movant's "initial burden of showing, not merely asserting, 'an absence of evidence to support the nonmoving party's case,' and thus movants were found to have waived the argument). *See also Schnellbaecher v. Baskin Clothing Co.*, 1989 WL 197432, at \*1 (N.D. Ill. Nov. 6, 1989) (moving party bears the initial burden of proving that a fact is not in question). Although that waiver alone requires denying the motion, even if Defendants had been forthright and tried to provide some evidence in their favor, there would still be ample contrary evidence to raise a question of fact for the jury based on the reasonable inferences from the following:

- Vigilant contracted with a company called Likeness to provide replacements for the deleted TLO booking photos, RDSF at ¶32;

- Vigilant deleted the TLO booking photos shortly before it uploaded the Likeness photos, *id.*;

12

- The Likeness agreement was signed on August 24, 2014, *id.*;

- The contract with Likeness required it to provide a minimum of 12 million "initial" booking photos within the first week after the agreement became effective, PSOAF at ¶5;

- The agreement became effective on the earlier of the date on which Vigilant set up its servers and downloaded the entire Likeness database or October 1, 2014, *id.*;

- On or about September 30, 2014, Vigilant downloaded Plaintiff's booking photo from Likeness, and that booking photo was from Plaintiff's 2007 admission to Cook County Jail, RDSF at ¶32;

- Vigilant's 2014 Facial Recognition Overview is dated 12/19/2014 and states that FaceSearch has over 14.1 million booking photos as of October 2014, PSOAF at ¶7.

From these facts, it is reasonable to infer that Vigilant deleted at least 14 million TLO booking photos. As noted above, it had at least 16 million booking photos prior to deletion, and it had 14.1 million after receiving at least 12 million replacement photos from Likeness (16-14 is 2; 2 plus 12 is 14).  PSOAF at ¶8.

An additional reasonable inference is that Plaintiff Sanders' 2007 booking photo was in the 14 million deleted photos.

- Prior to deleting the TLO photos, Defendants stated that their jail booking photos came from three sources: sex offender websites, CrimeStopper

13

- websites, and from the online booking photo databases of local agencies from more than half of U.S. states. See RDSF at ¶12.

- Vigilant itself used a webcrawler to scrape the CrimeStopper and sex offender websites. RDSF at ¶22. Plaintiffs were not charged with any sex offenses, and there is no evidence (nor reason why) they were on a CrimeStopper website.

- The Cook County Jail made its booking photos available online through its website no later than 2007. PSOAF at ¶9. This included images of all prisoners in custody. *Id.*

- Plaintiff Sanders was a prisoner in custody of CCJ from 2007 until his exoneration in July of 2014. PSOAF at ¶1. Therefore, his photo was in the online database and available to anyone accessing the site from 2007 until 2014. *Id.*

- Likeness obtained Plaintiff Sanders' 2007 booking photo, which shows TLO could have as well. RSDF ¶32.

- The 14 million deleted TLO photos are greater in number than the 12 million Likeness replacements. PSOAF at ¶8.

From these facts, a reasonable jury could find that it is more likely than not that Plaintiff Sanders' 2007 photo provided by Likeness had also been provided by TLO. In fact, given that Defendants deleted the photos and there is no direct evidence of what they contained, Plaintiffs must rely only on inferences here; that is sufficient to create a genuine dispute of material fact at summary judgment. *See Jackson v. Bunge*

14

*Corp.*, 40 F.3d 239, 242 (7th Cir. 1994) ("The non-movant has the right to prove ... [their case] by circumstantial evidence, which consists of proof of facts and circumstances from which the jury may infer other connected facts, reasonably following from the proven facts and circumstances.") (internal citations omitted). *See also The Cincinnati Ins. Co. v. Lennox Indus., Inc.*, No. 3:14-CV-1731, 2016 WL 495600, at \*7 (N.D. Ind. Feb. 9, 2016), on reconsideration in part sub nom. *Cincinnati Ins. Co. v. Lennox Indus., Inc.,* No. 3:14-CV-1731, 2016 WL 1623209 (N.D. Ind. Apr. 25, 2016) (direct evidence of product defect especially difficult "where the product has been destroyed due to its malfunction"); *Hasenberg v. Asbestos Corp. Ltd.,* No. 13-CV-01325-SMY-SCW, 2015 WL 1280216, at \*2 (S.D. Ill. Mar. 18, 2015) (because of the "long latency periods" for mesothelioma, "plaintiffs in asbestos cases may have to rely on circumstantial evidence"; court held that inferences were sufficient to avoid summary judgment).

### C. Defendants Also Fail To Preclude A Factual Dispute About Whether They Had A Government Contract In September Of 2014.

Another factual claim critical to Defendants' summary judgment effort is that they had a government contract in place before they acquired Mr. Sanders' photo from Likeness. Specifically, they assert that they contracted with the Wilmette Police Department five days before they acquired Mr. Sanders' photo. Doc. 112 at 13. Putting aside the fact that a jury could find Mr. Sanders' photo was in the database well before 2014, there still exists a genuine dispute about whether a government contract existed in 2014.

For starters, Defendants have not put forth competent evidence. Neither affiant on whom they rely has personal knowledge of the consummation of a contract with Wilmette (nor Beaumont). RDSF at ¶24. Moreover, the documentary evidence falls short. The contract Defendants tendered for Wilmette is unsigned by anyone at Vigilant, *id.*, so there is a fatal absence of proof that the contract was consummated at all, much less before Vigilant uploaded the Likeness photos.

Additional evidence also contradicts the notion that the tendered document was consummated. The purchase order that Defendants include with the contract[4] is for a total of $11,480. RDSF at ¶24. Wilmette did not issue a check to Vigilant until December 2014, and when it did so the amount was $12,380. *Id.* The dollar amounts do not match and neither does the timing.[5]

A reasonable inference from the foregoing facts is that the unsigned contract document Defendants tendered was not consummated. Rather, the inference is that some later contract was entered into for which Defendants did not provide the purchase order. That is not the only possible inference, but this Court may not weigh the evidence or draw inferences in Motorola's favor on summary judgment. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) ("On summary

---

[4] To be clear, the contract document makes no reference to FaceSearch. It is for license plate recognition data. RDSF at ¶24. Defendants provided a purchase order document in addition to this contract which does mention FaceSearch, but which does not match up with the actual payment Wilmette made. *Id.* Likewise, Wilmette did not make a payment to Vigilant until December of 2014, further casting doubt on the fortuitous 5-day timing on which Motorola relies (the supposed September 24 contract and the September 30 upload date. *See id.*

[5] This stands in contrast to *Thornley*, where the records left no doubt that the Chicago Police Department had contracted with CDW prior to it obtaining the biometrics. *See* Doc. 115-1 at 6.

judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.") (citations omitted). Relatedly, Defendants provide no proof that a police sergeant can contractually bind the Village under its procurement rules. Accordingly, drawing inferences in Plaintiffs' favor as the Court must, Defendants have failed to preclude a question of fact as to whether they had a contract with Wilmette prior to September 30, 2014 (much less that the contract they eventually formed for $12,380 in December was even for FaceSearch at all).

The case for finding a contract between Vigilant and Beaumont Police Department is even weaker.[6] Defendants failed to produce a service agreement or a signed purchase order. RDSF at ¶26. Moreover, according to a Freedom of Information Act response from Beaumont, it has no record of a contract with Vigilant for any facial recognition products. *Id*. Accordingly, Defendants not only failed to provide evidence of an actual contract, the evidence in the record are inconsistent with their having been a contract. Summary judgment must be denied.

## III. Defendants' First Amendment Challenge Fails As A Matter of Fact and Law.

Given that the statute actually prohibits the conduct they have been engaging in since 2012, Defendants resort to challenging the statute itself as unconstitutional. They have not cited a single court to have made such a holding, and no court should.

---

[6] This Court need not reach the legal issue of whether the government-contractor exemption applies to agencies outside of Illinois because there is a genuine factual dispute about whether contracts existed with the only two agencies Defendants identify, Wilmette and Beaumont.

17

The crux of Defendants' ambitious argument rests on a fallacy. It is not true that they are simply republishing publicly available information. To the contrary, their complex and costly software system generates non-public, biometric information that does not enjoy robust First Amendment protection. This Court should decline to strike down BIPA as unconstitutional.

### A. Defendants Create and Sell Private Biometric Data That Is Not Publicly Available.

FaceSearch does more than simply pass along publicly available booking photos.[7] What FaceSearch does is use its own facial vectoring algorithms, which Vigilant specially developed in-house, to harvest data points that are used to create a new representation known as a "face print." RDSF at ¶13. As FaceSearch's Sell Sheet displays, the face print is calculated from facial vectors and measurements taken from the booking photo:



---

[7] If Defendants' facts were correct, there would be no basis for a constitutional challenge because BIPA does not regulate photographs. Rather, it regulates biometric identifiers, which means a scan of facial geometry, and biometric information derived from such scans. *See* 740 ILCS 14/10 ("'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." "'Biometric information' means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual.") Defendants concede that BIPA applies and are not arguing that they are exempted for merely publishing photographs. Accordingly, any First Amendment challenge that BIPA is unconstitutional as it applies to purveyors of mere photos is moot.

*Id., citing,* Exhibit 11 (Ex. 11 MOTOROLA_PLAINTIFFS_3-8) at MOTOROLA_PLAINTIFFS_4. To be clear, it is Vigilant's biometric face print, *not* the raw booking photo, that is used for comparison. *Id.*

Courts considering similar types of biometric data have had little difficulty concluding that face prints are categorically different than mere photographs, or even information derived from photographs. *See, e.g., Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1095 (N.D. Ill. 2017) (noting that the "face templates" … generated by Google do qualify as a "biometric identifier" under the Privacy Act. For each face template, Google is creating a set of biology-based measurements ("biometric") that is used to identify a person ("identifier"); *In re Facebook Biometric Info. Priv. Litig..*, 185 F. Supp. 3d 1155, 1171 (N.D. Cal. 2016) (citing cases); *also American Civil Liberties Union v. Clearview AI, Inc.,* No. 20 CH 4353, 2021 WL 4164452, at \*5 (Ill.Cir.Ct. Aug. 27, 2021). Indeed, a face template is one of the specified biometric identifiers in the Privacy Act, namely, a "scan of ... face geometry." 740 ILCS 14/10."). The *Rivera* court rejected Google's argument that BIPA does not apply to photographs or "information derived from photographs." *Id.* at 1093.

Accordingly, Defendants' factual characterization of FaceSearch as merely repackaging publicly available information has been rejected already. *See Rivera*, 238 F. Supp. 3d at 1097 ("[A] photograph is just that—a photograph, *not* a scan of face geometry, which is a set of biology-based measurements."). Indeed, the Illinois Legislature expressed concern that biometrics, such as face prints, are "biologically unique to the individual; therefore, once compromised, the individual has no recourse,

19

is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS 14/5(c).

### B. Strict Scrutiny Does Not Apply.

As explained above, Defendants' characterization of their product as a mere republication of government-issued data is simply false. None of the authorities they cite on this score affords them First Amendment protection for the non-private, biometric information they market. Defendants' motion overlooks that a person's biometric data is private, not public information. *See In re Clearview AI, Inc., Consumer Priv. Litig.*, No. 21-CV-0135, 2022 WL 444135, at \*2 (N.D. Ill. Feb. 14, 2022), *clarified on denial of reconsideration,* No. 21-CV-0135, 2022 WL 2915627 (N.D. Ill. July 25, 2022), citing *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020) (BIPA protects "private information" and a person's "private domain"); *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019) (discussing a person's "private affairs"). Federal and state governments have recognized certain categories of information as private and have enacted sensible regulations to safeguard that information. BIPA is one of those regulations.

Unsurprisingly, BIPA's prohibition on obtaining biometric data has been held not to violate the First Amendment. *Wilk et al. v. Brainshark, Inc.*, No. 21-CV-4794, 2022 WL 4482842, at \*8 (N.D.Ill. Sep. 27, 2022) ("BIPA §§ 15(a) and (b) do not restrict Brainshark's speech and therefore do not implicate the First Amendment."); *Sosa v. Onfido, Inc.,* No. 20-CV-4247, 2022 WL 1211506, at \*15 (N.D. Ill. Apr. 25, 2022). *See also Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 950 (7th Cir. 2015) (federal statute prohibiting obtainment of "personal information" that would aid in

identifying individuals from the Illinois Secretary of State is "not a restriction on speech at all").[8] Defendants' First Amendment argument here fails.

With respect to the dissemination of biometric information, here, too, Defendants' constitutional challenges fall short. None of their cited authorities deal with the scenario at hand, where biometric data is extracted and used to construct new, non-public information that invades individual privacy. *See, e.g., Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495 (1974) (state placed information into the public domain); *Willan v. Columbia Cty.*, 280 F.3d 1160, 1163 (7th Cir. 2002) (disclosing a felony conviction, which was a matter of public record, did not violate political candidate's right to privacy, arguably as distinct from "the revelation of intensely private financial or medical information that was not a matter of public record or germane to his candidacy"); *Nieman v. VersusLaw, Ic.*, 512 F. App'x 635, 636 (7th Cir. 2013) (addressing republication of documents in public record). Moreover, the arguments Defendants construct against a "compelling state interest" depend on factual inaccuracies and faulty premises. For instance, Defendants argue that "Illinois law requires that the photos and the information contained within them be made publicly available." It cannot seriously be argued, however, that Illinois law requires companies to develop algorithms, construct unique digital reproductions of people's faces relying on personal biometric data, and then sell them for profit. And there *is* a compelling state interest in protecting unique biometric identifiers: as the statute itself states, biometrics, such as face prints, are "biologically unique to the

---

[8] Defendants have waived any argument that BIPA fails a rational-basis test, which would be unavailing anyway.

21

individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS 14/5(c).

The recent *Clearview AI* decision from this District is instructive. *Clearview AI*, 2022 WL 444135, at \*2. The plaintiff class alleged that Clearview "covertly scraped over three billion photographs of facial images from the internet and then used artificial intelligence algorithms to scan the face geometry of each photograph to harvest the individuals' unique biometric identifiers and information." As did Vigilant, "Clearview then created a searchable database containing this biometric information and data that allows users to identify unknown individuals by uploading a photograph to the database." *Clearview AI*, 2022 WL 444135, at \*2. Clearview argued that its capture and analysis of public images was protected speech.

The court first concluded that Clearview did more than simply republish public photographs and "some source code," but engaged in "additional conduct of harvesting nonpublic, personal biometric data." *Id.* at \*3. Clearview's product thus "involves both speech and nonspeech elements." *Id.* The court applied the intermediate scrutiny standard from *United States v. O'Brien* and observed that where "elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.*, citing *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The court went on to conclude that BIPA survived intermediate scrutiny, as explained more fully below.

22

Ignoring *Clearview AI*'s analysis, Defendants seek strict scrutiny by characterizing BIPA's restriction as "content-based." Doc. 112 at 17. They argue that it restricts the "use and publication of a specific type of information—alleged biometric data that may be gleaned from a government-published booking photo," and that it is "speaker-based" by burdening government contractors who serve non-Illinois agencies but not Illinois agencies.[9] Neither challenge is well-grounded. BIPA does not mention, let alone target, government-published booking photos. It generally restricts the acquisition and/or dissemination of biometric data, which is not content-based. *See Sosa,* 2022 WL 1211506, at *15; *American Civil Liberties Union v. Clearview AI, Inc.,* No. 20 CH 4353, 2021 WL 4164452, at *7 (Ill.Cir.Ct. Aug. 27, 2021) ("If BIPA regulated, say, capture of faceprints of people yelling but not faceprints of people smiling, *that* would be a content-based distinction. BIPA does nothing of the sort."). Nor is Defendants' speaker-based argument any more relevant, given that Defendants have not presented this Court with any valid out-of-state contracts.

Defendants have not cited any decision that applies strict scrutiny to BIPA. Quite the contrary, those courts to have considered it have found that the prohibition against acquiring biometric data did not regulate speech in the first place, as discussed above, or have applied intermediate scrutiny to its dissemination.

---

[9] Defendants briefly mention Section 14/25(c)'s reference to financial institutions, but that provision is clearly intended to avoid conflict with provisions of a particular federal statute. 740 ILCS 14/25(c) ("Nothing in this Act shall be deemed to apply in any manner to a financial institution or an affiliate of a financial institution that is subject to Title V of the federal Gramm-Leach-Bliley Act of 1999 and the rules promulgated thereunder."). The Gramm-Leach-Bliley Act, in fact, enacts a privacy rule for financial institutions to safeguard consumer financial data.16 C.F.R. §313 (2000).

*Clearview AI*, 2022 WL 444135, at \*3. To satisfy intermediate scrutiny, BIPA must (1) be within the power of the government to enact, (2) further an important government interest, (3) the governmental interest must be unrelated to the suppression of free expression, and (4) any incidental restriction on speech is no greater than is necessary to further the government interest. *Id.* at 377. Just as the *Clearview AI* court recently held, BIPA meets these factors.

First, BIPA furthers the important government interest in "protect[ing] Illinois residents' highly sensitive biometric information from unauthorized collection and disclosure." *Id.* at \*3, citing 740 ILCS 14/5(c) and *Rosenbach v. Six Flags Entm't Corp.,* 129 N.E.3d 1197, 1206 (Ill. 2019). BIPA's interest is unrelated to the suppression of free expression, as it "does not restrict a particular viewpoint nor target public discussion of an entire topic under the third *O'Brien* requirement." *Id.* (internal citations omitted). Finally, as to the fourth factor, the court found that "BIPA is narrowly tailored by legitimately protecting Illinois residents' highly sensitive biometric information and data, yet allowing residents to share their biometric information through its consent provision." *Id.* (internal citations omitted).[10]

---

[10] Defendants acknowledged but elected not to address *Clearview AI* or *Sosa,* despite the fact that they are clearly on point. *See* Doc. 112 at 15 n.4. They should not be permitted to ambush Plaintiffs in reply with new arguments and analysis not previously offered -- when Plaintiffs will have no opportunity to respond. Defendants strategically chose not to address *Clearview AI* and *Sosa* and so have forfeited any attempt to do so for the first time in reply. *See Thorncreek Apartments III, LLC v. Vill. of Park Forest,* 970 F. Supp. 2d 828, 841 (N.D. Ill. 2013).

The primary case on which Defendants rely, *Sorrell v. IMS Health*, does not alter the analysis. At issue in *Sorrell* was a Vermont law that restricts the sale, disclosure, and use of records that reveal the prescribing practices of individual doctors. 564 U.S. 552, 557 (2011). The Court first found that the law enacted content- and speaker-based restrictions by allowing "educational communications" and government messages for "countering" the brand-name pharmaceutical manufacturers, for instance, but prohibiting only pharmaceutical manufacturers and detailers from engaged in pharmaceutical marketing, a protected type of speech. *Id.* at 563-64 ("the information may be purchased or acquired by other speakers with diverse purposes and viewpoints" but not by detailers for marketing purposes). That alone differentiates BIPA from the Vermont statute, as BIPA applies broadly to any "private entity" without differentiating by type or purpose. 740 ILCS 14/15(a) ("A private entity…"), 14/15(b) ("No private entity…"). The Vermont law, by contrast, targeted pharmaceutical detailers with precision, a fact that was significant to the *Sorrell* Court. 564 U.S. at 564 ("Vermont's law thus has the effect of preventing detailers--and only detailers--from communicating with physicians in an effective and informative manner."), 565 ("Formal legislative findings accompanying § 4631(d) confirm that the law's express purpose and practical effect are to diminish the effectiveness of marketing by manufacturers of brand-name drugs").

Because the Vermont legislature targeted pharmaceutical marketers from engaging in a very specific type of speech (marketing to physicians), the *Sorrell* Court

25

considered it viewpoint restriction and applied heightened judicial scrutiny. *Id.* at 565-566 ("The First Amendment requires heightened scrutiny whenever the government creates "a regulation of speech because of disagreement with the message it conveys."). Defendants gloss over this significant distinction to rely on *Sorrell*. Indeed, Defendants do not identify any speech they wish to engage in after using individuals' biometric data. *See Sosa*, 2022 WL 1211506, at *14.

But even were Vermont's law and BIPA sufficiently analogous as to both warrant heightened judicial scrutiny (which they are not), *Sorrell* differs in another dispositive way: the state was unable to demonstrate a compelling justification because the statute "was not drawn to serve" the stated interest, medical privacy. *Id.* at 572-73 ("Under Vermont's law, pharmacies may share prescriber-identifying information with anyone for any reason save one: They must not allow the information to be used for marketing. Exceptions further allow pharmacies to sell prescriber-identifying information for certain purposes, including "health care research." And the measure permits insurers, researchers, journalists, the State itself, and others to use the information. All but conceding that § 4631(d) does not in itself advance confidentiality interests, the State suggests that other laws might impose separate bars on the disclosure of prescriber-identifying information.)". In *Sorrell*, essentially all uses of the protected information were *permitted* except for one, which was content- and viewpoint-based. By contrast, all uses of biometric information are *prohibited* by BIPA except for a narrow exception for government agencies and those aiding government agencies in fulfilling a government function.

26

*See* Doc. 112 at 12 "(Section 25(e) was adopted only in recognition of the fact that "government agencies often enlist private companies to help them perform government functions.").

Defendants have failed to demonstrate that BIPA violates the First Amendment.

## IV. Defendants Have Failed To Carry Their Burden At Summary Judgment On Their Dormant Commerce Clause Challenge.

The crux of Defendants' dormant commerce clause attack is that Plaintiffs are allegedly treating non-Illinois governmental contractors differently than Illinois governmental contracts under Section 25(e). Defendants misapprehend Plaintiffs' argument. Defendants have failed to establish at summary judgment that they enjoy the government contractor exception *at all*, regardless of where the government agency exists. As explained above, Vigilant has been a free-agent vendor selling FaceSearch to private customers all along, so they cannot seek cover behind Section 25(e). Furthermore, they have not established any government contracts, whether with Wilmette, Illinois or Beaumont, California. Accordingly, this Court need not reach the merits of their dormant commerce clause argument.

Nor have Defendants offered any facts from which the Court could conclude that BIPA actually impacts business conducted "wholly outside" of Illinois, if it does at all. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("The Dormant Commerce Clause prohibits "the application of a state statute to commerce that takes places wholly outside of the State's borders, whether or not the commerce has effects within the State."). They have not identified any conduct that occurs wholly outside of

27

Illinois, let alone shown that the burden on such conduct is excessive. This absence is fatal to their claim, particularly at summary judgment, for the fact-intensive inquiry required by the dormant commerce clause analysis. *Vance v. Int'l Bus. Machines Corp.,* No. 20 C 577, 2020 WL 5530134, at *4 (N.D. Ill. Sept. 15, 2020) (cannot decide whether BIPA violates the dormant commerce clause without a full factual record) (collecting cases); *see also Karling v. Samsara Inc.*, No. 22 C 295, 2022 WL 2663513, at *5 (N.D. Ill. July 11, 2022) (dormant commerce clause argument premature without adequate factual development); *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1104 (N.D. Ill. 2017) (whether BIPA as applied controls "commercial conduct wholly outside Illinois is not possible to figure out without a better factual understanding" of the defendant's system); *In re Clearview AI, Inc., Consumer Priv. Litig.*, No. 21-CV-0135, —— F.Supp.3d ——, ——, 2022 WL 444135, at *4 (N.D. Ill. Feb. 14, 2022) (same); *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846, at *8 (N.D. Ill. Sept. 15, 2017) (same).

## V. Defendants' Unjust Enrichment Defense Fails.

Defendants' argument against Plaintiffs' unjust enrichment claim is entirely predicated on their winning summary judgment on the underlying claims. However, Plaintiffs have established that their underlying claims are well-grounded and cannot be dismissed at summary judgment. Defendants' argument fails, and summary judgment on this claim must be denied.

Respectfully submitted,

/s/ Michael Kanovitz
Attorneys for Plaintiffs


Arthur Loevy
Michael Kanovitz
Jon Loevy
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, Illinois 60607
(312) 243-5900
mike@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, Colorado 80302
(720) 328-5642

*Counsel for Plaintiffs*

29

## CERTIFICATE OF SERVICE

I, Michael Kanovitz, an attorney, certify that on October 3rd, 2022, I filed a copy of the attached Plaintiffs' Memorandum in Opposition to Defendants Motorola Solutions, Inc. and Vigilant Solutions, LLC's Amended Motion for Summary Judgment via the Court's electronic filing system and thereby served a copy on all counsel of record.


/s/ Michael Kanovitz